HOAG & STEERE V. MARTIN *et al.*

1. **Husband and Wife**: GIFTS TO WIFE: HUSBAND'S CREDITORS. The title to land purchased by a wife with money paid her for keeping her husband's mother, and realized from keeping boarders and trading, at a time when her husband was out of debt, cannot be questioned by subsequent creditors of her husband, on the ground that they were misled into trusting him by a belief that he owned the property.

2. ———: OWNERSHIP OF PROPERTY ON WIFE'S FARM. The crops and live stock produced and accumulated upon a farm owned by a wife, on which the work was done by her and her boys, belongs to the wife as against the husband's creditors, even though the husband attends to the business affairs of the wife, if done voluntarily. (See *Carn v. Royer*, 55 Iowa, 650, and *Russell v. Long*, 52 Iowa, 250.) Nor is her title to be defeated by the fact that her husband listed the property to the assessor in his own name, she, however, furnishing the money to pay the taxes on it.

3. ———: ———: ESTOPPEL OF WIFE AS AGAINST HUSBAND'S CREDITORS. Where a wife owned a farm, and the stock and crops thereon were the product of her labor and that of her sons, but the husband, who was physically unable to do farm work, transacted the business of the wife, and, in so doing, listed the property for taxation in his own name, and the plaintiffs, believing that the husband owned the property, and relying upon his statement that he was joint owner of a lot of steers, took his notes, in a novation contract, for a debt which he was owing another, but the wife did no act, beyond allowing him to transact her business as aforesaid, to mislead the plaintiffs, and omitted no act which good faith toward them required her to perform, *held* that she was not estopped to assert her title to the property as against them, when they sought to subject it to the payment of a judgment upon the notes so taken.

*Appeal from Hardin District Court.*—Hon. D. R. Hindman, Judge.

FILED, JUNE 4, 1890.

THE plaintiff firm is a judgment creditor of the defendant, John A. Martin. Samantha Martin is the defendant and intervenor in the suit, and is the wife of John A. Martin. Arthur P. Martin is the son of John A. and Samantha Martin. Samantha Martin is the owner of the legal title to a certain farm in Hardin county, on which was the personal property, the ownership of which is involved in this proceeding. Plaintiff took execution on its judgment, and by virtue thereof seized such personal property as belonged to John A. Martin, its judgment debtor. Arthur P. and Samantha Martin, by their answers, claim joint ownership of the property, and that the judgment debtor has no interest therein. Plaintiff makes no claim to the undivided half of the property claimed by Arthur P. Martin. As to the other half it avers the ownership in John A. Martin; that, if Samantha Martin is the owner, she is by her conduct estopped from now claiming it; and that she was a party to a secret family arrangement to cheat and defraud the plaintiff. The district court gave judgment for the plaintiff, and the defendants appeal.

*H. L. Huff* and *G. W. Ward*, for appellants.

*F. M. Williams* and *Albrook & Hardin*, for appellee.

GRANGER, J. — An unsatisfactory feature of the trial of this class of cases in an appellate tribunal is that while, of necessity, some facts and evidence must be stated in an opinion, it is not generally a reflection of the entire record, and the convictions and conclusions of the court are of necessity based in part on evidence and facts, undisclosed by the case as reported, which

may leave in the minds of those familiar with the record an impression that undue prominence is given to some facts, or that others are overlooked; but the difficulty is one that in practice cannot be avoided.

I.  We may properly first look to the question of Mrs. Martin's ownership of the property.  The facts, somewhat in detail, as claimed in support of her ownership, are that she was married to John A. Martin in 1842, in New Hampshire; that, after their marriage, her husband's mother desired to live with them, and two older brothers of her husband, under obligations for the mother's support, agreed that, if they (John A. and Samantha) would take the mother, they would pay them therefor; that the mother lived with them some twelve years, and after her death Samantha received therefor a note of nine hundred dollars, which was afterwards paid, with seven years' interest; that this, with what she otherwise earned, made her fourteen hundred dollars, which she had when she came west, and she then owned an undivided half interest in some land near Iowa Falls, from which she realized five hundred dollars; that the money she earned was by keeping boarders and selling matches; that she inherited after she came west six hundred dollars from her uncle, and a brother of her husband gave her two hundred dollars; that she purchased a house and two lots, which she afterwards sold for seventeen hundred dollars; the house and lots, as we understand, being bought with the money realized as before stated; that John A. Martin and his wife came to Iowa in 1863, and that in January, 1865, John C. Mendenhall conveyed to Harvey Martin and Samantha Martin, jointly, the farm which Mrs. Martin claims to own, on which the property in question was found, and in April, 1867, Harvey Martin conveyed his undivided half to Mrs. Martin; that in January, 1871, Mrs. Martin and her husband conveyed said farm to one Painter; and that in January, 1875, Painter reconveyed the land to Samantha

*1. HUSBAND and wife: gifts to wife: husband's creditors.*

Martin, since which time she has held the title. At the time of coming to Iowa, John A. Martin owned some lands in Adair, Dallas and Guthrie counties; in all, six hundred and forty acres. John A. Martin was in the jewelry business in Iowa Falls from 1877 to 1882, and he realized, when the business was closed out, some sixteen hundred dollars. John A. Martin also, at one time, owned some lots in Iowa Falls, and a farm in Franklin county; but it does not appear whether or not this property was in addition to that before stated. It is to be kept in mind that we are now considering alone the *bona fides* of Mrs. Martin's ownership of the farm, as both parties seem to have considered it important in determining the ownership of the personalty in question. With regard to her ownership of the farm, if it was the turning point in the case, we might say that her claim thereto would hardly be shadowed by a doubt. There is nothing in the record to show a motive for concealing the real ownership of the real estate at any time. Her husband, during all the real-estate transactions, owed no debts, and had property in his own name up to the year 1882. From 1863, Mrs. Martin has been continuously the owner of real estate of considerable value, with repeated transfers of the same, and always in her own name, as evidenced by the records of the transactions. Her husband, during much of the time, has also been the owner of real and personal property; and as to that the transfers have been in his name, so far as the record discloses, and no claim is otherwise made. She has been the owner of the farm in question for twenty-two years. There is some testimony, and some claim in argument, that the money brought from the East, which was invested in the farm, was earned in part by the husband, and that it could not legally be regarded as Mrs. Martin's; and authorities are cited bearing on the question of the rights of husband and wife to the earnings of the wife. It is not necessary to review them. Whatever may have been Mr. Martin's right to the avails of keeping his mother,

it is true that in the settlement the money was paid to the wife as hers by the consent of the husband, which he had a right to give; for, even if it be regarded as a gift, it was valid, not being against the interest of any third party. The same is true of money realized by keeping boarders and the selling of matches. There were no creditors to be defrauded by the transaction; and, if she had the money, and invested it in the land, parties who trusted the husband long after the land was purchased cannot complain of being misled thereby. We have no hesitancy in saying that her ownership of the farm is free from the fraudulent taint.

II. We next inquire as to her actual ownership of the personalty in question. The property consists of hay, corn, horses, colts, cows, calves and other young stock, ranging from one to three years old. It was property that had been grown, or purchased and placed, on the farm, and was there kept. As to the stock, it was unquestioned that Arthur P. Martin was a joint owner, and he was a partner with his father or his mother, and as to this the parties dispute, as the actual partner with Arthur P. is surely the owner of the property. When the partnership was formed, about 1882 or 1883, it was for the purpose of operating the farm, and the stock on the farm was then appraised, and Arthur P. was to pay one-half the appraised value. The crops raised were to be fed on the place, and, of the stock bought, each was to pay one-half. Each was to own one-half the stock and of the profits. Arthur P., John A. and Samantha Martin all testify that the contract of partnership was with Samantha. This contract was made at a time when there appears to have been no motive for disguising actual facts. The contract involved the operation of the farm owned by Samantha, and it would naturally have been with her. The only facts tending to a contrary view upon this particular question are the acts of both Samantha and Martin, whereby John A. transacted the business much as he would have done if he had

2. ——: ownership of property on wife's farm.

been the partner. It is true that he did do the business for Mrs. Martin, in so far as we may speak of *business* independent of the work of the farm. He bought and sold for her, and generally attended to her business, not only as to the partnership, but in all her matters. In some particulars it appears that he did this as if he were the real party in interest, or doing the business for himself ; but there is no instance in which it appears that he did so with her knowledge, barring, perhaps, assessments of personal property to be hereafter noticed. Mrs. Martin was not a business woman in the popular sense of the term. She was a hard-working woman, and for years, while their boys were in their minority, she, with their assistance, carried on the farm ; she herself in many respects discharging the duties of a farm hand, working in the fields and yards of the farm. Her husband was a cripple from his early boyhood, having a withered or " perished " limb, and was of feeble health and unable to do farm work. In view of these facts it was but natural, and in the ordinary course of experience, that he should attend to the business affairs of his wife ; and the fact that his labor in this respect aided in the accumulation of the property, if voluntarily done, would not divest her of title, or give him a specific interest therein. The cases of *Carn v. Royer*, 55 Iowa, 650, and *Russell v. Long*, 52 Iowa, 250, sustain this view.

It is urged that the record shows that John A. Martin had quite a large amount of property,—from seven thousand to ten thousand dollars,—and that it is not accounted for. It is true, there is not a satisfactory accounting for all that he seems to have had, but we fail to see upon what theory the burden must be upon Mrs. Martin to account for the absence of her husband's property, before it is in some manner traced to her possession or control. If she had received it, that of itself would not be sufficient to invest her husband with the title to property which was otherwise hers, but the record affords no such proofs. For several years, when

the assessor came to make the assessments, Mr. Martin gave in the statement or listed the property now claimed by his wife, and swore to the assessment in his own name. If there were other convincing cir- cumstances in favor of plaintiff, this, added, would much strengthen its case. But, of itself, it is not sufficient to overcome the strong case of ownership in favor of the wife. The proof is that she herself paid the taxes ; that is, she furnished the means; and in experience it is not unlikely that in many cases where the wife really owned the property, and the husband was her business agent, the property might be given in for assessment as his own, and without objection by her. A careful review of the testimony convinces one that Mrs. Martin had little idea of the requirements or methods of assess- ments. She says in one place : "My husband gave in my assessments. Yes, I was present, but he did all my business. Yes, I was present ; it was done at our house. Mr. Pyle was the assessor. Why, they were all on the farm, and my cattle. I do not know as he told him who owned them. He told him that was the number of the cattle on the farm. I did not swear to the assessment, of course. No, sir ; I don't think Mr. Martin did." In other parts of her testimony she speaks of the property being assessed in his name, as it really was, but it is doubtful if she comprehended the import of what was done, or gave it much thought.

III. Is Mrs Martin estopped by her conduct to deny her husband's ownership of the property? What has been said before in the opinion will

3. ____:____: estoppel of wife as against hus- band's credi- tors.

have some reference to this branch of the case. We now look more particularly to the claim of the plaintiffs against the hus- band, and how the plaintiff firm has been affected by the conduct of Mrs. Martin as to her husband's man- agement of her property. It is important in this con- nection that we look to the indebtedness of John A. Martin to the plaintiff, and what Mrs. Martin knew of or did in relation to it. In 1882, John A. Martin

Hoag & Steere v. Martin.

subscribed for two hundred and fifty shares in what is known as Iowa Falls Mineral Spring Improvement Company at ten dollars per share, and paid thereon five hundred dollars. In May, 1887, there had been assessments made on these shares so that John A. Martin was owing the company one thousand dollars. At this time the company owed the plaintiff, and, by agreement of the plaintiff, the company and Mr. Martin, the plaintiff took the notes of Martin and discharged the company from its obligation. The debt to plaintiff was for lumber furnished the company to erect its building, on which the plaintiffs held a mechanic's lien as security. Plaintiff now seeks to hold the property in controversy for the payment of its judgment on these notes. It also appears, as we understand, that Mrs. Martin deeded to the company some land and received therefor five hundred dollars in stock, which she gave to her husband. The theory upon which appellants urge the estoppel is, Mrs. Martin's knowledge of her husband's buying the stock, and her permitting him to so manage her property as to mislead the plaintiff, and induce it to accept the notes in lieu of its secured claim against the company. It appears in evidence that when the notes were taken, John A. Martin represented to the plaintiff that he owned sixty-five or seventy steers, jointly with Arthur P. Martin, and that plaintiff so believed; that it relied on the assessment in his name, and a general belief in the community that John A. Martin owned the personal property. There is little more to be said than has been as to the facts. It does not appear that Mrs. Martin had knowledge of the note transaction before or when it took place, or was guilty of any acts to deceive the plaintiff any more than the general public. There is no pretense that at any time or in any manner, when occasion required her to speak, she did not, or that she actually participated in any deception. We have held that she had a right to have her husband transact her business for her. It was all done on a farm that she openly owned, which would go far to indicate

that it was her business, or to put parties on inquiry to know the facts. It was once the law of the state that a wife entrusting her property to her husband must give a record notice of her ownership, or suffer its loss, if credit was extended under a misbelief as to ownership. For reasons best known to the legislative power, that law was canceled, thus indicating a more liberal rule as to the management and custody of such property. While appellee complains that Mrs. Martin permitted it to accept the notes of her husband in ignorance of her ownership of the property, it does not indicate what particular act she should have done to give it notice, nor are we prepared to suggest one, unless we say she must herself have transacted the business, or at least not permitted her husband to. If it appeared that she knew of plaintiff's purpose to extend the credit to her husband and kept silent, the case might be different, but to what extent we need not say. This is the only indebtedness of her husband, and, conceding that she knew of his obligations to the company, she did not know that the plaintiff intended to accept his notes. There is nothing in the record to indicate that she should have anticipated any abuse of the trust confided to him. There had never been complaints, nor grounds for any. To our minds there is no ground for an estoppel, legal or equitable, and we think the plaintiff's bill should be dismissed.

REVERSED.